UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

AARON DAVIS,

           Plaintiff,

                                           Case Number 08-10077-BC

v.                                        Honorable Thomas L. Ludington

MICHIGAN AGRICULTURAL
COMMODITIES, INC.,

           Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING AMENDED COMPLAINT WITH PREJUDICE

On February 27, 2008, Plaintiff Aaron Davis ("Plaintiff") filed an amended complaint [Dkt. # 7], alleging claims of discrimination (count I) and retaliation (count II) under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq., against his former employer, Defendant Michigan Agricultural Commodities, Inc. ("Defendant"). Plaintiff claims that Defendant regarded him as "disabled" and alleges that Defendant terminated his employment based on that misperception. Plaintiff also alleges that Defendant subjected him to harassment and eventually terminated his employment based on his complaints of discrimination and his filing of a discrimination charge with the EEOC.

Now before the Court is Defendant's motion for summary judgment [Dkt. # 14], filed on November 7, 2008. On November 25, 2008, Plaintiff filed a response, and on December 5, 2008, Defendant filed a reply. The Court has reviewed the parties' submissions and finds that the facts and the law have been sufficiently set forth in the motion papers. The Court concludes that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the

motion be decided on the papers submitted. *Compare* E.D. Mich. LR 7.1(e)(2).  For the reasons stated below, Defendant's motion for summary judgment will be granted.

I

Plaintiff was born on December 29, 1975.  Defendant hired Plaintiff as a "general laborer" on October 29, 2001.  Defendant is a large grain handler, which owns and operates eight grain elevators, has cooperative relationships with four other grain handlers, and has a capacity to store up to thirty-million bushels of grain at one time.  Two of Defendant's elevators are located in Gratiot County, and are referred to as the "Stout" and "Ransom Road" plants.  According to Defendant, Plaintiff generally worked at the Ransom Road plant, but was sometimes assigned to work at the Stout plant as company needs required.

Plaintiff's job duties as a general laborer were varied, but often they were dangerous.  Indeed, Plaintiff testified that his job duties could be dangerous.  For example, one of Plaintiff's primary job duties was to clean the inside of grain bins.  To do so, Plaintiff would enter the grain bin, a confined space, and sweep or knock grain from the walls of the bin, which could be up to thirty feet deep.  Because the grain bin is a confined space, the work is performed by pairs of employees, only one of whom can enter the bin at a time.  The other laborer stays outside the grain bin, but serves as a lifeline and safety net to the employee who is inside.  To clean the grain bin, a laborer either enters through a side door or is manually lowered, by rope, through the top of the bin.  When entering through the door, the laborer runs the risk of being buried and crushed by the collapsing grain as it is knocked down.  Entry from above requires the laborer to manually descend from the top of the grain bin, about 125 feet above the ground, while harnessed to a co-worker.  Either method requires constant vigilance by both laborers, who cannot see each other through the

2

grain dust and must remain in constant communication.  Plaintiff completed this task "almost every day" of his employment.  Plaintiff was required to attend a three to five day training course to learn how to safely work within the confined space of a grain bin.

Plaintiff also routinely operated heavy equipment, including a fork truck, a front-end loading tractor, and a railcar mover.  Plaintiff testified that he used the fork truck to move pallets of grain and other items around Defendant's facilities, and testified that he frequently operated the "big" front-end loader for "everything."  He also acknowledged that he needed to be "really careful" while operating the railcar mover, a van-sized vehicle that moves up to five or six railcars at one time, often in vehicle traffic and near pedestrians.

In addition, Plaintiff's job required him to load and unload grain from railcars and trucks.  To do so, Plaintiff had to climb atop the car and hold the grain spout to ensure that the grain was distributed evenly.  Plaintiff testified that because of the high speed at which the grain is dispensed, a laborer must hold and control the spout while being "whipp[ed] all around" because it is "out of control."

During the harvest season, from September to January, when Defendant operates 24-hour shifts, Plaintiff occasionally staffed the control room and "[ran] the plant."  In these instances, Plaintiff controlled the entire grain distribution system from a centralized location, including setting the direction and speed of the grain distribution system, starting and stopping the system if necessary, and monitoring grain distribution to prevent "a big fire or explosion."  During the third shift, only one other person was present.  As an essential part of his job, Plaintiff also performed general maintenance.  This included equipment maintenance, such as changing oil and adjusting equipment, changing light bulbs at the roof of the plant, and cleaning grain dust from under and

around equipment and grain belts to prevent explosions.

Plaintiff's supervisor, Dave Marr, who is also Defendant's facilities manager, testified that Plaintiff was generally qualified to be a laborer.  Between the beginning of Plaintiff's employment and January 2006, Marr testified that he had no disciplinary issues with Plaintiff and that Plaintiff was a good worker.

In January 2006, Plaintiff suffered a back injury while working at Defendant.  Two days after the injury, Plaintiff was allowed to return to work without restrictions, while taking Vicodin for the pain.  After about one week, Plaintiff switched to Tylenol to control his pain.  In approximately February or March 2006, Plaintiff began having seizures of varying degrees at unpredictable intervals.  Plaintiff had experienced seizures as a child, which his mother described as lasting twenty to twenty-five seconds, during which Plaintiff would tremble, and then he would go to sleep.  While Plaintiff's childhood doctor did not identify a cause of the seizures, he was apparently able to control the seizures through medication.  Plaintiff stopped experiencing the seizures by the time he entered middle school as a young teenager.

Plaintiff's recent seizures have included mild seizures where he is dazed, disoriented, and not aware of what is going on around him, and more severe seizures where he has physically dropped to the floor or grabbed hold of something to prevent a fall, shaken, and cried.  One of Plaintiff's treating physicians, Dr. Weiguo Zhao, noted that Plaintiff has experienced periods of "loss of awareness without reason" and spells of "dizziness."  Subjectively, Plaintiff describes his seizure experience as feeling "scared" and having a sensation of "dropping down a 450-foot roller coaster."  According to Plaintiff, he is capable of resuming normal activities after a seizure.

On March 6, 2006, Marr saw Plaintiff have three seizures in the late afternoon; Marr decided

4

Plaintiff should not return to work until he had a doctor's clearance.  According to Plaintiff, Marr told him not to come to work, and to "get fixed."  Plaintiff's medical records indicate that he visited Dr. Zhao three days later, on March 10, 2006.  He reported to Dr. Zhao that his seizures began "about three weeks ago," lasted approximately ten to fifteen  seconds each time, and had occurred eight to ten times a day during the prior week.  Dr. Zhao started Plaintiff on Depakote, an anti-seizure medication.

In April 2006, Dr. Zhao continued to adjust Plaintiff's medication in an effort to control his seizures.  Plaintiff admits that as of early May 2006 his seizures were not fully controlled. Defendant assigned Plaintiff to assist in the grading station, where he could work without risk to himself or others.  According to Defendant, this was not a permanent solution because the grading station was already fully staffed by an employee with years of experience in the position.  In a letter dated April 27, 2006, Defendant notified Plaintiff that if he did not receive a "clean bill of health," Defendant would "have to reevaluate [his] position with the company," as Plaintiff's assignment to the grading station was only temporary.

Plaintiff met with Dr. Zhao on May 2, 2006, and reported that he had no daytime seizures. Dr. Zhao increased Plaintiff's Depakote prescription and gave Plaintiff permission to return to work with restrictions that, according to Defendant, effectively prevented Plaintiff from doing his regular job: "no climbing high, working near pond of water, or places where [his] seizure would injure self or others."  Despite the changes to his medication, Plaintiff's seizures continued.  On May 3, 2006, co-workers witnessed Plaintiff seize and drop to the floor.  Six days later a co-worker witnessed Plaintiff have another seizure at the grading station.

On May 10, 2006, Plaintiff was in a car accident on his way home from work.  According

5

to Plaintiff, the car accident was not caused by a seizure but happened when a tire blew on his vehicle. Marr came to the scene of the accident, and Defendant placed Plaintiff on a medical leave beginning May 11, 2006.

Defendant obtained a referral for Plaintiff to see Dr. Surendra Kaul. Plaintiff was pleased to have the referral, because he did not feel Dr. Zhao was helping him. Plaintiff's first appointment with Dr. Kaul was on June 16, 2006. At that time, Plaintiff had stopped taking the Depakote prescribed by Dr. Zhao. Dr. Kaul ordered some tests, including a 24-hour electroencephalogram ("EEG"), which confirmed that Plaintiff was experiencing seizures, talked with Plaintiff about safety concerns, and advised Plaintiff not to drive, climb, use drugs, or drink alcohol.

Dr. Kaul's treatment plan aimed to find the correct balance of anti-seizure medications for Plaintiff. Dr. Kaul began by placing Plaintiff on Topamax. On July 27, 2006, Dr. Kaul received a call from Plaintiff's wife indicating that Plaintiff was still having seizures, so Dr. Kaul adjusted Plaintiff's medication and told him that he could not work at least until his next appointment on August 8, 2006. At that appointment, Dr. Kaul prescribed a second medication, Klonopin, for Plaintiff. Believing that Plaintiff's seizures were mostly happening at night, Dr. Kaul released Plaintiff back to work, "so long as he takes his medications." Plaintiff returned to work the next day, August 9, 2006, and Defendant placed him back into his regular position as a general laborer.

After Plaintiff returned to work, Bob Coyle, Plaintiff's supervisor, witnessed Plaintiff have five to six seizures. Plaintiff's wife also called Dr. Kaul at least twice in September 2006 to report that Plaintiff was still having seizures. Other employees of Defendant saw Plaintiff have seizures at work in October 2006. Marr testified that he does not remember if Plaintiff's seizures continued past August 2006.

6

In approximately late October or November 2006, Bruce Sutherland, vice president of Defendant, and Marr met with Plaintiff and offered him two options: Plaintiff could either accept a severance package or take another medical leave until his seizures were medically controlled and he could safely perform his job. Plaintiff elected to take a second medical leave and to continue his treatment. His second medical leave began on November 2, 2006. According to Plaintiff, at this time he complained to Marr and "others" that he believed that Defendant was discriminating against him. Plaintiff also testified that Marr told him that he could not keep having his "episodes" because he was "putting people's lives on the line."

By November 14, 2006, Dr. Kaul reported that Plaintiff still "was not responding adequately to the regimen of medication" he had been given. Dr. Kaul adjusted Plaintiff's Topamax dosage and required Plaintiff to take it twice a day to prevent daytime seizures. Dr. Kaul also prescribed two new medications, Requip and Dilantin, but he did not release Plaintiff to work.

On December 7, 2006, Plaintiff secured a note from Dr. Kaul's nurse practitioner, allowing him to return to work without restrictions. However, Defendant did not allow Plaintiff to immediately return to work. Instead, Defendant asked Plaintiff to bring his job description to Dr. Kaul to ensure that Dr. Kaul understood the nature of his job duties. On March 12, 2007, Dr. Kaul signed a release allowing Plaintiff to return to work, stating "[h]e is seizure free for five months and can return to his job with the job description that was provided so long as he takes medications." However, Dr. Kaul still did not allow Plaintiff to drive, requiring Plaintiff to be free from seizures for one more month.

Defendant allowed Plaintiff to return to work at the Stout plant on April 16, 2007, in his normal position of general laborer. According to Plaintiff, this was the first time that he was

7

assigned to work at the Stout plant, rather than the Ransom Road plant. According to Plaintiff, his new supervisor, Mike Federspiel, was extremely critical of everything that Plaintiff did, would swear at him, and call him an "idiot" and a "moron." Plaintiff alleges that Federspiel assigned him to cleaning grain dust almost exclusively, while less senior employees performed more complex work. Additionally, Federspiel began documenting "issues" with Plaintiff's employment on Plaintiff's second day at the Stout plant. Federspiel acknowledged that, normally, he only documented employee issues if there had been performance problems in the past.

According to Defendant, Plaintiff's medical records clearly indicate, however, that his seizures were still not medically controlled. On June 6, 2007, Plaintiff underwent an EEG that showed that he continued to have seizures. On June 18, 2007, Plaintiff's wife called Dr. Kaul to report that "he almost had a seizure last week" and that Plaintiff's Dilantin levels had dropped to an ineffective level. As a result, Dr. Kaul increased Plaintiff's Dilantin dosage from two to three times per day.

In August 2007, Plaintiff filed a complaint with the EEOC, which Marr became aware of before Defendant terminated Plaintiff's employment. Also in August 2007, Dr. Kaul received a call from Plaintiff's wife about nocturnal seizures. Dr. Kaul confirmed in his deposition that Plaintiff's seizures still were not fully controlled at that time. Then, according to Defendant, on September 29, 2007, Plaintiff again experienced seizures at work. At least one of these seizures occurred while Plaintiff was unloading a semi-truck. A witness noted that Plaintiff "had a hold of the truck and trembled for ten to fifteen seconds." A co-worker described Plaintiff as gripping the tailgate of the truck, his face turning beet red and trembling. Another co-worker, who witnessed Plaintiff's seizure at the truck-dump area, saw Plaintiff have a second seizure in the control room less than an hour

later.  One week later, on October 6, 2007, a co-worker again witnessed Plaintiff have a seizure in the truck-dump area.  Plaintiff never told Dr. Kaul about these seizures and disputes that they occurred.

According to Defendant, Defendant terminated Plaintiff's employment, effective October 8, 2007, because Plaintiff's seizures rendered him unable to safely perform the essential functions of his assigned job and Defendant had no other positions available for which Plaintiff was qualified. Dr. Kaul testified that as of December 2007, Plaintiff's seizures were eighty-percent controlled.  He also testified that it would not be safe for Plaintiff to operate a forklift, operate a tractor, climb, or act as a lifeline to someone below him in a grain elevator if he was still experiencing seizures.

## II

Under Rule 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  A fact is "material" if its resolution affects the outcome of the case. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001).  "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000).  An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248).  When the "record taken as a whole could not lead

a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).

The party bringing the summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The party who bears the burden of proof must present a jury question as to each element of the claim, *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000), rather than raise only "metaphysical doubt as to the material facts." *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

III

Plaintiff asserts claims for discrimination and retaliation under the ADA. Plaintiff does not contend that he is "disabled" under the ADA. On the contrary, he contends that he was not disabled and that Defendant wrongly regarded him as "disabled." Plaintiff claims that Defendant terminated

10

his employment based on this misperception.  At the same time, Plaintiff claims that Defendant terminated his employment based on his complaints of discrimination and his filing of a discrimination charge with the EEOC.

Defendant presents four main arguments in its motion for summary judgment.  First, Defendant argues that Plaintiff cannot prove discrimination under the ADA because Defendant did not regard Plaintiff as disabled.  Second, Defendant argues that Plaintiff cannot prove discrimination under the ADA because Plaintiff was not qualified for his position.  Third, Defendant argues that Plaintiff cannot prove retaliation under the ADA because Defendant did not take any materially adverse actions against Plaintiff.  Fourth, and finally, Defendant argues that Plaintiff cannot prove retaliation under the ADA because Plaintiff cannot show a causal connection between any protected activity that he engaged in and Defendant's termination of his employment.

A

The ADA prohibits discrimination by a covered entity "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  A prima facie case of disability discrimination under the ADA requires that a plaintiff show that he or she: (1) is disabled, (2) is otherwise qualified for the position, with or without reasonable accommodation, (3) "suffered an adverse employment decision," and (4) "suffered such action under circumstances which give rise to an inference of unlawful discrimination."  *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 364-65 (6th Cir. 2007) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), and *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177-86 (6th Cir. 1996)).  The ways

11

in which a plaintiff may establish the fourth element are context-specific; one way is to show that "after rejection or termination the position remained open, or the disabled individual was replaced." *Id.* at 365 (quoting *Monette*, 90 F.3d at 1185).

Defendant argues that Plaintiff cannot establish a prima facie case of discrimination under the ADA for two reasons. First, Defendant argues that Plaintiff cannot offer any proof that Defendant regarded Plaintiff as "disabled" to satisfy the first element of a prima facie case because Defendant did not regard Plaintiff as restricted from a "broad range of jobs in various classes." *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001). Second, Defendant argues that Plaintiff cannot show that he was a "qualified individual" to satisfy the second element of a prima facie case because his seizure disorder poses a "direct threat" to health and safety.

1

With respect to the first element of a prima facie case, the ADA defines a "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C). The regarded-as-disabled prong of the ADA "protects employees who are perfectly able to perform a job, but are rejected . . . because of the myths, fears and stereotypes associated with disabilities." *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008) (internal citations and quotations omitted). Individuals may be regarded as disabled when "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). "In both cases, it is necessary that a covered entity entertain

misperceptions about the individual." *Id.* "[P]roving such a claim 'takes a plaintiff to the farthest reaches of the ADA' and is a question 'imbedded almost entirely in the employer's subjective state of mind.' " *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 704 (6th Cir. 2008) (quoting *Ross*, 237 F.3d at 709). Notably, "the employer's motive . . . is one rarely susceptible to resolution at the summary judgment stage." *Ross*, 237 F.3d at 706.

Yet, such a claim requires proof that "the employer regarded the employee as 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.' " *Id.* (quoting *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 317 (6th Cir. 2001) and 29 C.F.R. § 1630.2(j)(3)(i)). " 'It is not enough . . . that the employer regarded that individual as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as disabled within the meaning of the ADA.' " *Id.* at 709 (quoting *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 646 (2d Cir. 1998)).

Defendant argues that Plaintiff cannot offer any proof that Defendant regarded Plaintiff as "disabled" to satisfy the first element of a prima facie case because Defendant did not regard Plaintiff as restricted from a "broad range of jobs in various classes." *Id.* at 706. To support its argument that Defendant did not regard Plaintiff as disabled, Defendant emphasizes that it temporarily permitted Plaintiff to assist at the grading station because Defendant recognized that Plaintiff could work safely in that department. In addition, when Defendant requested that Dr. Kaul review whether Plaintiff could return to work, Defendant sent only the detailed, specific "general laborer" job description to Dr. Kaul. Defendant did not ask Dr. Kaul to comment on Plaintiff's

13

ability to perform other positions or classes of positions.

In contrast, Plaintiff argues that under *Ross*, summary judgment is inappropriate.  In *Ross*, the court found that when there is "substantial evidence that an individual's medical status played a significant role in an employer's decision to fire that individual, [and] evidence that the employer concocted a pretextual justification for that firing, the need for more extensive factual inquiry into whether the employer engaged in unlawful discrimination is especially acute."  237 F.3d at 709.  In other words, evidence of pretext may tend to show that an employer regarded the plaintiff as disabled.  *Id.*

Indisputably similar to *Ross*, in this case, Plaintiff's medical condition played a significant role in Defendant's decision to terminate his employment.  In addition, Plaintiff argues that Federspiel's documentation of alleged job performance issues with Plaintiff, which purportedly justify Plaintiff's discharge, are simply a pretext for discrimination.  The difficulty with this argument is that while Defendant admittedly considered Plaintiff's work performance when it made the decision to terminate Plaintiff's employment, the decisive factor appears to have been Plaintiff's seizure disorder.  In other words, Defendant did not rely on Plaintiff's performance "issues" to justify its termination of Plaintiff's employment.  Rather, Defendant relied on the potential threat to health and safety that Plaintiff's seizure disorder created.

Accordingly, the Court will grant Defendant's motion for summary judgment on Plaintiff's discrimination claim because Plaintiff has not advanced any evidence that tends to show that Defendant regarded Plaintiff as limited from performing any job other than his position as a general laborer.  In contrast, Defendant has advanced evidence that tends to show that it only considered Plaintiff's seizure disorder to the extent that it interfered with his ability to perform the job duties

14

of a general laborer.  Viewing the facts in the light most favorable to Plaintiff, a reasonable jury

could not find that Defendant regarded Plaintiff as disabled.

2

Even if Plaintiff could satisfy the first element, Plaintiff must still prove the second element

of a prima facie case, which is that Plaintiff was "otherwise qualified" for his position as a "general

laborer."  Plaintiff must be able to demonstrate that he is "an individual with a disability who, with

or without reasonable accommodation, can perform the essential functions of [his] position."  42

U.S.C. § 12111(8).  "Reasonable accommodations" include modifications to the job or work

environment that enable a qualified person with a disability to perform the essential functions of the

job.  42 U.S.C. § 12111(9); 29 C.F.R. § 1630.2(o).

"A job function is essential if its removal would fundamentally alter the position."  *Kiphart*

*v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001).  Employers are not required to eliminate or

reassign essential job functions, *see Laurin v. Providence Hosp.*, 150 F.3d 52, 56 (1st Cir. 1998),

nor must an employer create a new position to accommodate a disabled employee.  *Monette*, 90 F.3d

at 1187.  Moreover, an employer is not required by the ADA to employ someone who poses a "direct

threat" to himself or others if the threat cannot be eliminated by making a reasonable

accommodation.  *See* 42 U.S.C. § 12113(b).  EEOC regulations define "direct threat" as "a

significant risk of substantial harm to the health or safety of the individual or others that cannot be

eliminated or reduced by reasonable accommodation."  29 C.F.R. § 1630.2(r).

"The determination that an individual poses a 'direct threat' shall be based on an

individualized assessment of the individual's present ability to safely perform the essential functions

of the job.  This assessment shall be based on a reasonable medical judgment that relies on the most

15

current medical knowledge and/or on the best available objective evidence." *Id.* "In determining whether an individual would pose a direct threat, the factors to be considered include: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm." *Id.*; *EEOC v. Prevo's Family Market, Inc.*, 135 F.3d 1089, 1095 (6th Cir. 1998).

Defendant argues that Plaintiff cannot show that he was a "qualified individual" to satisfy the second element of a prima facie case because his impairment poses a "direct threat" to health and safety, which cannot be eliminated by reasonable accommodation.  The fact that Plaintiff's job duties were inherently dangerous is undisputed.  Defendant emphasizes that to eliminate the hazards of the position would require Defendant to eliminate virtually all of Plaintiff's job duties, which are particularly dangerous for someone who experiences uncontrolled seizures.  Dr. Kaul testified that as of December 2007, Plaintiff's seizures were eighty-percent controlled.  He also testified that it would not be safe for Plaintiff to operate a forklift, operate a tractor, climb, or act as a lifeline to someone below him in a grain elevator if he was still experiencing seizures.

According to Plaintiff, Defendant's conclusion that Plaintiff posed a direct threat was based solely on speculation and was inconsistent with the individual medical assessment performed by Dr. Kaul.  Dr. Kaul evaluated Plaintiff, reviewed his job description, and determined that Plaintiff was medically able to return to work as long as he took his medications.  Dr. Kaul testified that Plaintiff's seizures were eighty-percent controlled and that he only experiences occasional night-time seizures.  According to Plaintiff, the risk of the recurrence of seizures or harm to Plaintiff or other employees was speculative, especially considering that Plaintiff's seizures have never caused harm to himself or to others.

16

While Plaintiff characterizes the risk as "speculative," the undisputed facts show that Plaintiff had been experiencing unpredictable seizures for over one year, and was still experiencing them at night. Even his doctor testified that Plaintiff's seizures were not one-hundred percent controlled. Even if the risk that Plaintiff would experience a seizure during the day was small, the inherently dangerous nature of his position deserves significant weight in the analysis of whether Plaintiff is a "direct threat." *See, e.g.*, *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 894 (9th Cir. 2001) (finding that "the severity and scale of the potential harm to others presented by [the plaintiff's] employment . . . pose[d] a significant risk under the direct-threat analysis" even though "the likelihood of an accident [was] small") (citing *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 231 (3d Cir. 2000)). Taking all the facts in the light most favorable to Plaintiff, there is no genuine issue of material fact that he was a "direct threat," given the combination of the inherently dangerous nature of the general laborer position and the unpredictability of Plaintiff's seizure disorder.

Plaintiff also argues that Defendant was aware that Plaintiff could have been "reasonably accommodated" by allowing him to continue to work at the grading station. However, Plaintiff does not allege that he is disabled under the ADA; an employee is only entitled to a reasonable accommodation under the ADA if he is actually "disabled," rather than regarded as disabled. *Gilday v. Mecosta County*, 124 F.3d 760, 764 n.4 (6th Cir. 1997) (noting that "a person without an actual disability would not need any accommodation"); *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 (6th Cir. 1999) (stating that if the jury found that the defendant only regarded the plaintiff as disabled, as opposed to finding that the plaintiff was actually disabled, such a finding "would obviate the [defendant's] obligation to reasonably accommodate [the plaintiff]"). Plaintiff cannot argue, on the one hand, that although he is not disabled, Defendant regarded him as disabled, and on the other

17

hand, that Plaintiff was entitled to a reasonable accommodation for his "disability" which was only based on Defendant's perception. The two arguments are simply incompatible.

Moreover, while Defendant bears the burden of proving that "a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship" on Defendant, *Monette*, 90 F.3d at 1186, Plaintiff bears the burden to "establish that a 'reasonable' accommodation is possible" and that he is "qualified for the position with such reasonable accommodation." *Id.* at 1186 n.3. Plaintiff has not challenged Defendant's characterization of the essential job requirements. Although Plaintiff argues that Defendant could have reasonably accommodated Defendant by allowing him to work at the grading station, Plaintiff does not dispute Defendant's assertion that there was no open grading station position. Thus, Defendant cannot be said to have violated the ADA by failing to provide a reasonable accommodation.

B

The ADA's prohibition on retaliation prevents an employer from "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a). To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in protected activity, (2) his exercise of such protected activity was known by his employer, (3) the employer took an action that was materially adverse, and (4) a causal connection existed between the protected activity and the materially adverse action. *E.E.O.C. v. SunDance Rehab. Corp.*, 466 F.3d 490, 501

18

(6th Cir. 2006); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).[1]

Defendant argues that Plaintiff cannot prove his retaliation claim for two reasons. First, Defendant argues that Plaintiff cannot show that Defendant took any "materially adverse" actions against Plaintiff because any "harassment" of Plaintiff was inconsequential. Second, Defendant argues that Plaintiff cannot show that a "causal connection" existed between Defendant's alleged perception of Plaintiff as disabled and any alleged materially adverse actions because much of the alleged "harassment" took place before Plaintiff filed an EEOC charge and was not based on Plaintiff's allegedly perceived disability.

1

The Sixth Circuit has defined an adverse employment action as a "materially adverse change in the terms and conditions of [the plaintiff's] employment." *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004) (quoting *Hollins v. Atl. Co.*, 188 F.3d 652, 662 (6th Cir. 1999)). "Examples of adverse employment actions include firing, failure to promote, reassignment with significantly lower responsibilities, a material loss of benefits, suspensions, and other indices unique to a particular situation." *Id.* at 575-76 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). An action is "materially" adverse if it "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Burlington N.*, 548 U.S. at 68 (internal citation omitted). The term "material" is meant to "separate significant from trivial harms." *Id.* Said another way, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees

---

[1] "Retaliation claims are treated the same whether brought under the ADA or Title VII." *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997).

experience." *Id.*

Plaintiff claims that the following acts of harassment were acts of retaliation: Plaintiff was transferred from the Ransom Road plant to the Stout plant. Federspeil yelled at him, including calling him lazy, a moron, and using profanity. Federspeil yelled at Plaintiff and told him he could pack his things, go home, and be fired if he did not like it, while using profanity. Federspeil told Plaintiff that lunch breaks were not guaranteed and sometimes he did not allow Plaintiff to take a lunch break. Federspeil was "basically being a jerk" to Plaintiff.

According to Defendant, all of these actions predated Plaintiff's EEOC charge filed in August or September 2007. Thus, they could not have been prompted by a desire to retaliate, because the "protected activity" had not yet occurred. *See, e.g.*, *Prechtel v. Kellogg's*, 270 F.App'x 379, 381-82 (6th Cir. 2008) (finding that the plaintiff had failed to establish a prima facie case of retaliation when the employer was not aware of the pending EEOC charge at the time of the alleged retaliation). However, according to Plaintiff, he also complained to Marr and "others" that he felt he was being discriminated against in or around October or November 2006, when Defendant presented Plaintiff with the option of choosing another medical leave or a severance package. Thus, Defendant's conduct, as described above, could potentially be characterized as retaliation against Plaintiff for voicing his complaints of perceived discrimination.

Additionally, the following alleged conduct occurred after Plaintiff filed his EEOC charge: On September 29, 2007, Plaintiff worked 4.5 hours without receiving a break, and he worked 11.0 hours that day. On September 30, 2007, Plaintiff had to clean up a grain mess by himself, even though he had helped others clean up messes before; he overheard Federspeil tell a driver that Plaintiff was "only down to the Stout plant to shovel up messes." Federspeil did not train Plaintiff

20

to do anything at the Stout plant other than clean up messes and he was only permitted to dump grain trucks when other employees were on break.  On October 4, 2007, Plaintiff had to work all day by himself, cleaning up grain messes.  At the end of the day, Federspeil told Plaintiff "in a really bad tone of voice" that he "needed to start telling him where [he's] going or [he] could just leave right then."

Viewing these facts in the light most favorable to Plaintiff, Defendant's actions are not "materially adverse," because they are no different "from those petty slights or minor annoyances that often take place at work and that all employees experience."  *Burlington N.*, 548 U.S. at 68 (internal citation omitted) (stating that Title VII "does not set forth a general civility code for the American workplace") (internal quotation omitted); *Mayers v. Laborers' Health & Safety Fund of N. Am.*, 404 F. Supp. 2d 59, 62 (D.D.C. 2005) (stating that the ADA "does not guarantee an employee a comfortable work environment");  *Mendez Vazquez v. Tribunal Gen. de Justicia*, 477 F. Supp. 2d 406, 412 (D.P.R. 2007) (finding that "[t]o prove that a hostile work environment constitutes 'adverse employment action,' the plaintiff must show that the harassment was so severe or pervasive that it alters the conditions of the plaintiff's employment") (internal quotations omitted).  Based on the facts presented, Plaintiff cannot prove that Defendant's actions were "materially adverse" when they did not amount to "severe or pervasive" harassment.[2]

Accordingly, the Court will grant Defendant's motion for summary judgment on Plaintiff's

---

[2] Defendant also argues that the alleged conduct does not constitute "materially adverse" action because Plaintiff was not dissuaded from filing an EEOC charge due to Defendant's alleged conduct. However, the standard is an objective one, that is, whether a "reasonable employee" would have been dissuaded. *Burlington N.*, 548 U.S. at 68.  Thus, the way in which Defendant's conduct subjectively affected Plaintiff is generally irrelevant.

retaliation claim.[3]

2

Even if any of Defendant's actions could be considered "materially adverse," Plaintiff cannot prove the necessary causal connection between his alleged protected activity and Defendant's actions. With respect to the causal connection, Defendant emphasizes that Plaintiff testified that Federspeil preferred "his guys," and that Plaintiff must show that his EEOC charge was "a significant factor" in Federspeil's decision to treat Plaintiff differently than "his guys." *See Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (interpreting Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101, et seq.). "The 'significant factor' standard . . . requires a showing of more than a 'causal link.' A factor can be a 'cause' without being 'significant.' " *Id.* (quoting *Polk v. Yellow Freight Sys., Inc.*, 801 F.2d 190, 199 (6th Cir. 1986)). Moreover, "the mere fact that an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation to the discrimination claim." *Id.*

Plaintiff's own testimony suggests that Federspeil's alleged mistreatment of him was not prompted by Plaintiff's EEOC charge because the mistreatment began before Plaintiff filed the charge. Nevertheless, according to Plaintiff, he initially complained about discrimination in October or November 2006, and began experiencing the "harassment" described above almost immediately

---

[3] In his response to Defendant's motion for summary judgment, Plaintiff also asserts that Defendant's termination of his employment was a retaliatory action. Defendant contends that Plaintiff abandoned this claim during his deposition. If Plaintiff did not abandon the claim, termination of his employment is a "materially adverse" action. However, as discussed below, Plaintiff cannot prove a causal connection between Defendant's actions, including the termination, and any alleged protected activity by Plaintiff. Thus, regardless of whether Plaintiff has abandoned the claim that Defendant's termination of his employment was retaliatory, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

22

upon his return to work.  He filed an EEOC charge of discrimination in or about August 2007.

Following the filing of the charge, Plaintiff's working conditions worsened, and his employment was

ultimately terminated in October 2007, about two months after Plaintiff filed his EEOC charge.

Although a temporal connection may be apparent between Plaintiff's complaints and

Defendant's conduct, undisputed evidence demonstrates that Defendant's conduct, particularly with

respect to termination of Plaintiff's employment, was motivated by Plaintiff's seizure disorder itself,

rather than Plaintiff's complaints of discrimination.  Accordingly, no genuine issue of material fact

exists as to whether there is a causal connection between Plaintiff's protected activity and

Defendant's conduct.

IV

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment [Dkt. # 14]

is **GRANTED**.

It is further **ORDERED** that Plaintiff's amended complaint [Dkt. # 7] is **DISMISSED**

**WITH PREJUDICE**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: January 12, 2009

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 12, 2009.

s/Tracy A. Jacobs
TRACY A. JACOBS

---